UNITED. FIDELITY LIFE INSURANCE. COMPANY, Appellant,

v.

Mrs. Runie I. HALLMARK, Appellee.

No. 5007.

Court of Civil Appeals of Texas.

Beaumont.

Feb. 17, 1955.

Rehearing Denied May 4, 1955.

Storey, Sanders, Sherrill & Armstrong, Sanders, Lefkowitz & Green, Dallas, for appellant.

Helm & Jones, Houston, for appellee.

WALKER, Justice.

The defendant, United Fidelity Life Insurance Company, issued a policy to Carl C. Hallmark which insured his life for $1,000 and which, subject to certain conditions, also promised to pay an additional $1,000, termed "Double Indemnity Benefit", if his death was caused by a certain kind of accidental means. Mr. Hallmark died on April 7, 1948, and the plaintiff, who was his wife and the beneficiary named in the policy, promptly notified the defendant of his death and furnished the defendant with proof of death and on April 30, 1948, received the defendant's check for $1,000, which was all she claimed, and executed in defendant's behalf the release which is discussed below. The payment made was the sum owed for the death of the insured, regardless of how death occurred; and on March 29, 1949, the plaintiff filed this suit,

praying recovery of the double indemnity benefit· and other· damages. The cause was tried to a jury, and on the jury's verdict the trial court rendered judgment in behalf of the plaintiff, awarding her the double indemnity benefit, a penalty, and· an attorney's fee. From this judgment the defendant has appealed. .,

### Opinion.

.The defendant contends· under ,Point 2 that the plaintiff's release to the defendant barred this action. It is not necessary to quote this release; it is not ambiguous, and· by the .words ·"supplemental. contracts" plainly refers to the double indemnity benefit which, at its beginning, is entitled a supplemental contract. There was no dispute or crossclaim between the parties before plaintiff made this release; but this release was. at least prima facie a defense in bar. of the suit.

The plaintiff argues in avoidance that the defendant gave no consideration for a release of the double indemnity benefit, and there is authority for this contention. Thus, in Woodmen of the World Life Ins. Soc. **v.** Smauley, 153 S.W.2d 608, 612, the Eastland Court of Civil Appeals, speaking through a special judge, held that the double indemnity benefit was a distinct obligation, separate from the obligation to pay the ordinary life insurance benefits, ·and so applied a rule· of consideration stated as follows: "payment of an undisputed item, which is fully. liquidated and admittedly due and .owing, .will not constitute a consideration for the release of a disputed item between the same parties." In consequence, the court held that the release before them was without consideration insofar as it purported to discharge liability. for the double indemnity benefit.· These holdings were followed by the Ft. Worth Court of. Civil Appeals on· the second appeal of .the case, styled Woodmen of the World Ins. Soc. **v.** Brown, 164 S.W.2d 190. The language of these opinions indicates that the case adjudicated is .not to be distinguished from that before us because of any difference in the insurance contracts in suit. See also Machicek **v.** Renger, Tex.Civ.App.,

185 S.W.2d 486; Simms Oil Co. v. American· Ref. ·Co., Tex.Com.App., 288 S.W. 163.

On the other hand, the plaintiff's claim under the policy in suit would appear to be single, instead of two items, according to American Nat'l Ins. Co.· v. Walker, Tex. Civ.App., 81 S.W.2d 1061, 1063. That court held that a release was not supported by consideration insofar as it purported to discharge the liability for a double indemnity benefit, acting on a rule of consideration stated as follows: "Where there is no controversy between the insurer and the beneficiary in a life policy, as to the amount due, the policy is à liquidated demand and the payment of a less amount than is due is no consideration for à release and will· not·· bar a recovery of the full· amount due." See also National Mutual Benefit Ass'n v. Butler, Tex.Civ.App.; 72 S.W.2d 639; National Security Life & Casualty Co. v. Benham; Tex.Civ.App., 233 S.W.2d 334; Oviett v. Warner, Tex.Com.App., 288 S.W. 434.

There is authority in decisions of courts of other states for the plaintiff's contention that there was no consideration,. for her release of the double indemnity. benefit, even under the construction we give the ·· policy in suit, although there is some to the contrary. See 46 C.J.S., Insurance, § 1205, p. 146; American Life Ins. Co. v. Williams, 234 Ala. 469, 175 So. 554, 112 A.L.R. 1219; and citations hereinafter made.

However, the Smauley, Brown and Walker cases were not appealed to the Supreme Court; and it seems to us that the decisions now to be mentioned are controlling.

The first question to be determined is that concerning the· nature of the plaintiff's· right under the policy. The form of the contract indicates that the double indemnity benefit was treated as a distinct obligation, separate from that insuring life generally. Thus the part of the policy providing for this benefit is entitled a supplemental contract, as we have stated, and the promise is to pay "in addition to the amount payable under the life insurance policy."· A separate· .premium is charged for the double indemnity benefit. Certain provisions of

the agreement insuring life generally are adopted as parts of the agreement for a double indemnity benefit, but apparently not all. However, these circumstances are matters of form only. The condition on which defendant's obligation to pay matures is the one event, the insured's death, and the essence of the contract when it is viewed as a whole is simply this, to pay the beneficiary $1,000 if the death of the insured is natural and $2,000 if the death is caused by the prescribed accidental means. In the case of accidental death the plaintiff would get, under the double indemnity provision and the provision insuring life generally, the same sum of money and on the same conditions as she would get under a single promise to pay $2,000 for an accidental death. The division made of defendant's promises and the form given the contract in suit evidently bear some relation to the defendant's convenience in making a sale of insurance, enabling defendant to add to or to omit from a standard policy a relatively brief provision for accidental death and thereby to avoid the use of two policy forms. We accordingly think plaintiff's right is neither for two items, as held in the Smauley and Brown cases, nor simply one liquidated item as was held, or assumed, in the Walker case. Instead, it was a single claim for the death of the insured which, however, was greater or less according to the circumstances under which the death occurred. There is authority for this construction in the opinions of courts of other states. Cockcroft v. Metropolitan Life Ins. Co., 125 Pa.Super. 293, 189 A. 687, at page 689; Painter v. National Life & Accident Ins. Co., 158 Kan. 715, 150 P.2d 171, at page 173; Long v. Aetna Life Ins. Co., 259 Mich. 206, 242 N.W. 889, at page 890. The plaintiff's rights were similar to those of the beneficiary in Great Southern Life Ins. Co. v. Heavin, Tex.Com.App., 39 S.W.2d 851.

The next question is, what is the rule of consideration to be applied. The evidence shows that the plaintiff measured and tendered her own choice under the policy. The plaintiff's husband had applied for work in Arabia and as a result had been required to take injections of vaccines shortly before his death. Plaintiff now claims that these vaccines caused her husband's death. However, her proof of death did not show that insured's death was caused by the vaccines, and according to this proof she claimed of defendant only the $1,000 payable for natural death of the insured. There is no evidence that defendant made any independent investigation of the facts concerning the insured's death, and it is to be inferred that the defendant did not do so but, instead, acted on the proofs furnished by the plaintiff. The evidence is that, in response to the plaintiff's proofs of death, the defendant sent its check for the $1,000 claimed to a bank in the town where plaintiff lived, together with the release in suit; that the bank notified the plaintiff when these papers were received; and that the plaintiff then went to the bank, read the release and signed it and took the check. The nature of the plaintiff's claim is accounted for by the information she had; it appears that she first thought, because of statements made by the physician who came to her husband when he died, that her husband had died a natural death, and she remained of this opinion until on April 20th, thirteen days after her husband's death, she received a telegram to her husband stating that he had been accepted for labor in Arabia. This telegram raised some question in her mind as to whether the vaccines given her husband had had some connection with his death, but the evidence does not show as a matter of law either that she knew or ought to have known that the vaccines had had that effect when, two days afterward, she signed the proof of death and when, eight days still later, she signed the release.

The first matter to be determined pertaining to the question, what is the rule of consideration, is whether the plaintiff and the defendant had the power to fix a value upon the plaintiff's claim less than the sum due if the insured's death was accidental. Plaintiff's claim was liquidated, that is, for a stated sum, regardless of the conditions on which it depended; and there was no dispute between the parties before the release was made. However, the plaintiff's

claim was like an unliquidated claim in this sense; the sum of money to which the plaintiff was entitled, whether $1,000 for natural death or $2,000 for accidental death, depended on a question of fact which could be settled only by opinion. In this sense, the amount of the plaintiff's claim was uncertain and doubtful and the plaintiff's situation is analogous to that of Johnston in Inter-Ocean Casualty Co. v. Johnston, 123 Tex. 592, 72 S.W.2d 583. In this case Johnston, the insured, made claim under an accident policy for a surgeon's fee, a benefit payable under either one or another of two clauses of the policy. The physician who treated Johnston advised him that he would suffer no disability and Johnston gave this information to the insurer and claimed only the fee. It was paid to him by the insurer on his own proofs, without independent investigation, and he gave insurer a release in full. The effects of Johnston's injury later proved to be more serious and he sued for disability benefits. The Commission held that the release was supported by a consideration. The only question of consideration discussed is one to which we refer to below, namely, whether the fact that Johnston was entitled in any event to what he was paid affected the validity of the release, and the Commission held that it did not. Washington National Ins. Co. v. Cook, Tex.Civ.App., 80 S.W.2d 327, 329, was essentially the same sort of case and the Court of Civil Appeals followed Inter-Ocean Casualty Co. v. Johnston, but said that the agreement between insurer and insured was valid because of the inherent uncertainty, that is, the doubt, as to the extent of the insured's claim. Said the Court of Civil Appeals: "The question (of liability) was not discussed and the amount collectible, if any, was unknowable at the time. That was sufficient." See also Connell v. Provident Life & Accident Ins. Co., 148 Tex. 311, 224 S.W.2d 194.

The question of fact on which depended the sum plaintiff was entitled to was doubtful in the same sense in which the questions on which depended the sum Johnston and Cook were entitled to were doubtful, that is, it was a matter of opinion. If the parties can make a valid agreement fixing a value upon an unliquidated claim under the circumstances of the Johnston and Cook cases, we see no reason (unless the matter discussed in the second paragraph following is one) why the parties to the policy in suit cannot make a valid agreement resolving the question of fact on which depends the value of the plaintiff's claim under the plaintiff's policy.

It is also to be noted that plaintiff acted under circumstances at least no more favorable to her case than were those under which Johnston acted.

This brings us to the most prominent of the facts to be considered in connection with the question of consideration now at issue, namely, the fact that plaintiff was entitled to receive the sum paid to her regardless of the cause of her husband's death; defendant, in any event, was liable to the plaintiff for this sum of money. However, this fact is not material to the present question of consideration under the decision in Great Southern Life Ins. Co. v. Heavin, Tex.Com.App., 39 S.W.2d 851, at least as that decision was construed and applied in Inter-Ocean Casualty Co. v. Johnston. With this point settled against the plaintiff there is even less reason for not applying to this case the holdings made in the Johnston and Cook cases respecting the release of the unliquidated claims sued upon in those cases.

■ We accordingly hold that the release in suit was supported by a valid consideration, and we sustain Point 2.

Defendant has filed three other Points of Error.

Point 1 assigns error to the sufficiency of the evidence to show that Insured's death was accidental within the meaning of the provisions for double indemnity. This indemnity, subject to exceptions to which we shall later refer and to other provisions which need not be stated, was payable if insured's death resulted "from bodily injuries caused directly, exclusively and independently of all other causes, by external, violent and accidental means as evidenced

by a visible contusion or wound on the exterior of the body." The plaintiff contended, as we have stated, and the jury found that the insured's death was caused by the injection of vaccines, and as we understand defendant's argument, the contention made under Point 1 is that the evidence is insufficient either in law or in fact to show that the vaccines caused the insured's death, or at least, to show that the vaccines were the sole cause of death.

The insured was a carpenter and at the time of his death was in the 53rd year of age. He made application for work in Arabia and, in consequence, was required to take a physical examination and also, to take injections of four vaccines, namely, smallpox, typhoid, typhus and cholera. The medical examiner made a physical examination of insured on March 21st and took other information on the 22nd. The injection of vaccines began on the 21st and continued until April 1st, when the last of a series of five was given. The period during which injections were made was thus 11 days, and the intervals between injections is shown by the dates of injection, which were March 21st, 22nd, 25th and 29th, and April 1st. Insured's home was at Conroe but at the time of these proceedings he was working at Pasadena, in another county, and on April 1st or 2nd (these were Thursday and Friday and plaintiff said he came home on Thursday or Friday, although she thought Thursday more likely), he returned to his home in Conroe and he remained there until his death five or six days later. He died very suddenly and unexpectedly on April 7th and all of the physicians who testified agreed that the immediate cause of death was a coronary occlusion, and the jury so found under Issue 1. These physicians disagree, however, as to what produced the occlusion and as to what caused the producing agent to exist and act.

Dr. Brumby, a physician called by the plaintiff, expressed the opinion that the occlusion was caused by a clot and that the clot was caused to form by the crowding of the injections within a space of time shorter than usual. These opinions were based on the theory that disease can cause such a clot to form. Dr. Brumby also testified that serious illness and even death had resulted from the crowding of injections of vaccines. Admittedly these injections were usually extended over a substantially longer period of time. According to testimony of the medical examiner, who made the injections, these injections were usually given over a period of three weeks, one or a series being given each week, at intervals of a week. He said that he had reduced the period in Insured's case at the request of Insured and that Insured showed no unusual reaction from the injections. He said, too, that he had sometimes reduced the period in other cases, apparently at the request of the person involved. Dr. Brumby had never seen the insured and was testifying in response to hypothetical questions, but there is support in the medical examiner's testimony for Dr. Brumby's theory that disease could cause a clot.

Circumstances indicate that the vaccines caused insured's death and thus afford some confirmation of Dr. Brumby. There is evidence that when the injections began the insured was in excellent health and had had no serious illness for many years and that immediately after the injections began and during the period of injection he lost color, weight and strength and complained of being sick and that he did not feel well enough to carry his tool box when he left Pasadena and returned home on April 1st or 2nd. According to plaintiff the insured's arm showed the effect of the injections, and the Insured said that he had come home to rest, and he did nothing until the 7th except some small chores around the house. These circumstances indicate that Insured at least did not feel strong. Further, it is to be noted that death occurred within only a few days after the last injection; the entire period beginning with the first injection and ending with Insured's death was only 17 days, and there is testimony from the plaintiff that some effects of the injections were still visible on her husband's arms when he died. Further, it does not appear that Insured did anything on the day of his death which would have accounted for that

death. About noon of that day he left home to assist another person in putting a roof of composition shingles on a house. There was evidence that the weather was neither hot nor cold, and that the work Insured had to do was not strenuous. Plaintiff found Insured at home at 4:30 o'clock in the afternoon. He was then feeling ill and he died very suddenly a few minutes afterward.

■ We hold that there was competent and sufficient evidence that the injections caused the Insured's death, as the jury found under Issues 2 and 3.

■ It was an exception to liability under the provision for double indemnity if Insured's death was "caused by or contributed to by disease or mental infirmity" and the defendant argues that this exception was not rebutted by the evidence, but this contention is overruled. As we have stated, there was evidence that Insured was a carpenter, who was in good health prior to the first injection and had been for many years except for a few illnesses of no apparent seriousness or importance. He had had what is referred to in the evidence as a kidney attack about Christmas and he had also had some mild illness which plaintiff and Insured thought was influenza and had themselves treated; the jury were authorized to find that the latter illness had occurred before Insured's physical examination on March 21st. The jury were also authorized to find that the effects of both illnesses had ended before Insured was given the examination on March 21st and the first of the injections. The jury found under Issue 5 that Insured's death did not result directly or indirectly from any bodily or mental disease or infirmity and this finding was supported by the evidence, at least so far as disease and mental infirmity are concerned and it is these matters which are

the exceptions to the double indemnity benefit. The extraordinary occurrence which death from the injection of these vaccines was, and neither of the physicians who testified for the defendant had ever heard of such an occurrence, strongly tends to show that, since the Insured was suffering from no disease, he had some unidentified abnormality in his constitution; but such a matter is not excepted from the promise to pay the double indemnity benefit and we see no reason why it should be excepted otherwise.

■ Defendant also seems to say that the means of death were not proved to be "evidenced by a visible contusion or wound on the exterior of the body". The words quoted are a part of the provision for double indemnity benefit. There was testimony from Whatley that while the injections were being given, Insured complained of having a sore arm and that the Insured's arms were swollen. According to plaintiff's testimony Insured's arms showed evidence of the injections and the effects of the injections, not only when he came but also at the time he died. This contention is overruled.

These comments determine the several contentions made by defendant under Point 1, and Point 1 is overruled.

Points 3 and 4 have been considered but are overruled. It is enough to say of Point 3, under which defendant claims an estoppel against the plaintiff, that the evidence does not show as a matter of law that the plaintiff either knew or should have known that the vaccines caused Insured's death when she executed the proof of death or when she executed the release. She actually made no untrue statement to the defendant about the cause of death.

The judgment of the trial court is reversed and judgment is here rendered that plaintiff take nothing.